**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. <u>R.</u> 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-4016-21

IN THE MATTER OF THE
BUSINESS AUTOMATION
TECHNOLOGIES, INC., d/b/a
DATA NETWORK SOLUTIONS,

      Petitioner - Appellant/Cross-
Respondent,

v.

VERIZON NEW JERSEY, INC.,

      Respondent - Respondent/Cross-
Appellant.

_____

Submitted January 15, 2025 – Decided February 7, 2025

Before Judges Mayer and DeAlmeida.

On appeal from the New Jersey Board of Public Utilities, Docket No. TC17091015.

Andrew Marc Klein (Klein Law Group PLCC), attorney for appellant/cross-respondent.

Greenberg Traurig, LLP, attorneys for respondent/cross-appellant (Eric Wong, on the brief).

Matthew J. Platkin, Attorney General, attorney for respondent New Jersey Board of Public Utilities (Donna Arons, Assistant Attorney General, of counsel; Meliha Arnautovic and Matko Ilic, Deputy Attorneys General, on the brief).

PER CURIAM

Business Automation Technologies, Inc., d/b/a Data Network Solutions (DNS) appeals from a July 13, 2022 final agency decision issued by the New Jersey Board of Public Utilities (BPU). Verizon New Jersey, Inc. (Verizon) cross-appeals from the same BPU decision. We affirm on the appeal and cross-appeal.

We recite the facts from the hearings held by the administrative law judge (ALJ). DNS is a competitive local exchange carrier (CLEC). Verizon is an incumbent local exchange carrier (ILEC). Starting in 2003, Verizon provided telecommunication services to DNS under a BPU approved Interconnection Agreement (ICA) and other written agreements, including a "forbearance" contract, which exempted the contracts from state and federal regulations, and a Wholesale Advantage agreement for traditional telephone services. DNS provided basic local exchange services to New Jersey customers using wholesale services purchased from Verizon.

2

Throughout their relationship, DNS disputed Verizon's bills for services. DNS complained Verizon required it to reassert previously reported disputes monthly, which Verizon denied. DNS claimed it tried to contact Verizon employees with historic knowledge of the billing disputes to offer documents and explanations in support of DNS's position. DNS further alleged Verizon's employees frequently failed to cooperate in resolving the billing disputes.

On the other hand, Verizon asserted DNS failed to supply the requested data to resolve the billing disputes. Even if DNS supplied the required information, Verizon claimed DNS failed to submit the data through the established Verizon protocols for addressing billing disputes.

In 2016, different Verizon personnel were assigned to handle billing disputes. Verizon's new billing dispute team claimed DNS failed to timely pay assessed charges under the ICA and other agreements and carried a large past due balance.

Verizon claimed DNS was required to pay all sums due except charges subject to a "good faith dispute" under the ICA. To constitute a "good faith dispute," DNS needed to provide details and documents supporting a claimed dispute. Verizon requested DNS provide a "specific detailed accounting of any and all disputed charges, including dates, charges and a description of the

A-4016-21

facilities in question." DNS failed to provide the requisite details supporting its claimed "good faith dispute." As an alternative to providing the detailed billing dispute information, Verizon advised DNS could pursue dispute resolution under the ICA, or file a petition to have the matter reviewed before the Office of Administrative Law (OAL).

By 2017, DNS accrued a past due balance of approximately $298,000. To limit DNS's ability to receive services while simultaneously amassing a significant unpaid balance, Verizon embargoed DNS from ordering new services.

As a result of Verizon's action, in September 2017, DNS filed a petition with the BPU contesting Verizon's billing for access charges under the ICA. The petition identified three contractual arrangements governing services provided by Verizon: the ICA; the Wholesale Advantage agreement, which DNS alleged included intrastate services within the BPU's jurisdiction; and a "forbearance" contract for services exempt from federal and state regulation. According to the petition, DNS claimed Verizon improperly imposed an embargo on service orders under the ICA and the Wholesale Advantage agreement to "coerce" its payment of all disputed charges. DNS alleged Verizon breached the ICA; breached the duty of good faith by failing to negotiate in good faith; engaged in

A-4016-21

"illegal self-help actions" and "acts of improper retaliation" designed to force DNS from the telecommunications market; and violated "[BPU] rules pertaining to billing, account handling and dispute resolution." DNS requested the BPU adjudicate the disputed matters in its favor, direct Verizon to lift the embargo on new service orders, and order Verizon to cease collection efforts pending the BPU's "final reconciliation of all accounts," including payments, credits, and late charges.

In a December 29, 2017 order, the BPU directed Verizon to lift the embargo and continue providing services to DNS under the ICA until final resolution of the billing disputes. The BPU also transmitted the matter to the OAL as a contested case.

The OAL assigned the matter to an ALJ, who conducted Zoom hearings over eleven non-consecutive days between September and December 2020. The ALJ identified the following issues to be resolved:

- Whether DNS owed a past due balance to Verizon for tariff and/or ICA related charges and, if so, the amount of that balance.

- Whether DNS has continued to pay Verizon for undisputed charges.

- Whether Verizon's imposition of late charges was done properly and consistent with the ICA.

5

- Whether Verizon properly billed DNS for taxes and regulatory surcharges or whether DNS provided all required tax exemption certificates to Verizon.
- Whether Verizon's practice of assessing access charges on tandem transit trunks was proper.
- Whether the parties properly followed the dispute resolution process in the ICA.
- Whether the embargo instituted by Verizon preventing orders by DNS under the ICA was a violation of the ICA and other non-ICA contracts.

The ALJ left the record open to address certain issues, including the need for an accommodation on behalf of DNS's witness, Isaac Fajerman, due to a visual impairment.[1] The ALJ held a final hearing on April 8, 2021.

After the hearing closed, the parties filed post-hearing written submissions. The ALJ also requested supplemental filings, addressing "whether specific credits given by Verizon affected the amounts allegedly in dispute as of the date of the [p]etition." According to the ALJ, the parties agreed the amount Verizon claimed to be past due as of August 24, 2017, under the ICA and tariff was $32,991 and the amount due under the Wholesale Advantage agreement was $6,395. The ALJ closed the record in December 2021.

---

[1] Fajerman is the president and owner of DNS.

A-4016-21

The following witnesses testified for DNS: Fajerman; MaryLou Carey, a telecommunications consultant; and Fred Goldstein, a former telecommunications expert witness and DNS employee from 2003 to 2004. The following witnesses testified for Verizon: Peter D'Amico, who worked for Verizon for thirty-five years, spending the twenty-five years prior to retiring in 2018 as Verizon's product manager of voice services; and Brandon Chase Bartlett, Verizon's associate director for private sector collections.

The ALJ also considered documentary evidence related to the billing disputes. Pursuant to these documents, DNS could order services for different kinds of telephone traffic, routed over different kinds of "trunks," to different kinds of "interconnection points" (IPs) between DNS and Verizon networks. The ALJ summarized the documents governing the billing relationship between DNS and Verizon.

ICA

Under the ICA, Verizon issued a monthly statement of "itemized . . . charges" to DNS. Payment by DNS was due on the later of the due date in the bill or twenty days after DNS received the bill. The bills included taxes Verizon was legally obligated to collect and remit on sales of its services, except where DNS had a written tax exemption certificate.

A-4016-21

If DNS failed to make payment timely, Verizon could request "[a]ssurance of payment of charges" in the form of a cash security deposit or a letter of credit equal to two months of anticipated charges. Overdue payment amounts were subject to a late payment charge (LPC) not to exceed 1.5 percent per month on the total of such amounts, plus unpaid LPCs.

Section 9 of the ICA contained a dispute resolution provision. Under that section, DNS could assert "a good faith dispute" regarding "any portion of an amount billed," provided DNS gave Verizon "notice . . of the amounts it dispute[d]." The notice required DNS include "the specific details and reasons for disputing each item." This section also provided DNS could assert a dispute for "any class of charges" "with a single notice."

Section 12 of the ICA allowed either party to cure any breach of a "material provision" within thirty days, including the failure to make "any payment required by Section 9 of undisputed amounts." After thirty days, the nonbreaching party could issue a written notice to the "Defaulting Party," and exercise one of two options: (1) "suspend the provision of any or all Services" under the ICA, or (2) cancel the ICA and terminate all services under the agreement.

8

Section 14 of the ICA set forth the procedure for resolving billing disputes. Section 14.1 stated the dispute would be "addressed by good faith negotiation." Either DNS or Verizon could "initiate" a negotiation by providing a "written notice of the dispute that includes . . . a detailed description of the dispute or alleged nonperformance."

Section 14 required the written notice identify "an individual [to] serve as the initiating [p]arty's representative in the negotiation." The other party then had ten business days "to designate its own representative." The parties' designated representatives were required to "meet at least once" within thirty days following the written notice "in an attempt to reach a good faith resolution of the dispute." If the parties were unable to resolve the dispute within the thirty-day period, either party could "pursue any remedies available to it under this Agreement, at law, in equity, or otherwise, including, but not limited to, instituting an appropriate proceeding" before the BPU.

Section 18 of the ICA required the parties to act in good faith and provided:

> The Parties shall act in good faith in their performance of this Agreement. Except as otherwise expressly stated in this Agreement (including, but not limited to, where consent, approval, agreement or a similar action is stated to be within a Party's sole discretion), where consent, approval, mutual agreement or a similar action

9

is required by any provision of this Agreement, such action shall not be unreasonably withheld, conditioned or delayed.

The ICA included attachments describing the various services DNS could order and the type of IP necessary. Each service had its own billing rates and conditions. From DNS's perspective, the billing dispute involved whether DNS properly ordered the services it believed it requested from Verizon. From Verizon's perspective, the billing dispute involved whether Verizon correctly billed for the actual services DNS ordered.

Section 2.1.2 of the Interconnection Attachment to the ICA provided each party was responsible for the costs of delivering its traffic to the other party's IP. The various IPs belonging to DNS and Verizon had specific geographic locations. For certain kinds of traffic, the parties' IPs were the same because the traffic accessed the same switching equipment. This was known as a "tandem" arrangement. For other traffic, DNS paid Verizon to carry traffic between IPs—an "entrance facility and transport" arrangement—unless DNS elected to avoid the charge by using "collocation." Collocation is the placing of DNS's own switching equipment for the type of traffic at issue within the Verizon facility handling that traffic.

10

For DNS circuits connected to Verizon's network, section 2.2 of the Interconnection Attachment allowed DNS to order two types of trunks. "Interconnection trunks" were used for "tandem" traffic, which was traffic within the local access transport area (LATA). "Access toll connecting" (ATC) trunks were used for "exchange access traffic" between LATAs (interLATA traffic), and Verizon's billing included transport of that traffic between DNS's and Verizon's IPs.

Local Interconnection Service (LIS) Trunk Billing Dispute

During the hearing, Carey testified she helped CLECs, such as DNS, establish and manage networks pursuant to their ICAs. Carey also trained CLEC employees how to write service requests, and helped CLECs resolve various issues, including billing disputes. In 2014, DNS asked Carey to place orders with Verizon for LIS trunks so DNS customers could initiate and receive local calls to other carriers' customers.

At the hearing, D'Amico testified he provided services connecting to the public switch telephone network, including CLECs. D'Amico "handled all aspects of the product," including contracting, ordering, and network architecture.

On March 31, 2014, D'Amico emailed Carey regarding local access per the Newark-area LATA. D'Amico explained the ICA's Interconnection Attachment required DNS "to get their traffic to the Verizon IP(s) which are defined as the VZ tandem for tandem trunks and the V[Z] end office for direct end office trunks."

On April 8, 2014, Fajerman responded to D'Amico's email. Fajerman wrote, "You left out the fact we are meeting at the collocation." D'Amico explained collocation would allow the traffic in question to be billed on a "POVN"[2] basis, which would be indicated by the appearance of the "POVNAC" code when DNS submitted an Access Service Request (ASR). D'Amico replied to Fajerman as follows:

> Since we [are] meeting at the collocation, Verizon is willing to mutually agree to have both parties['] Interconnection Points ("IPs") be at the collocation. If you agree, this will allow [DNS] to have a "POVN–like arrangement" and populate the POVNAC in the SPEC[3] Field of the ASR which will drive the POVN billing arrangement.

Fajerman assented to D'Amico's proposal.

---

[2] "POVN" stands for "point of interconnection on the Verizon network." "POVNAC" stands for "point of interconnection on the Verizon network access transport."

[3] "SPEC" stands for "Service and Product Enhancement Code."

A-4016-21

According to Carey, the purpose of using LIS trunks was to permit DNS to pay to bring its traffic to the IP or collocation point on Verizon's network. She testified any dispute regarding the trunks could have been solved by reviewing the data in the switching equipment as well as the call detail records (CDR) and placing test calls if employees of Verizon and DNS had worked together.

D'Amico claimed Carey's March 28, 2014 email to Verizon erroneously asserted DNS had a POVN contract rather than a POI IP contract.[4] D'Amico explained section 2.1.2 of the ICA's Interconnection Attachment, providing "[e]ach party . . . at its own expense shall provide the delivery at a relevant interconnection point of the other party," precluded an interpretation that the IP would be a collocation point or a tandem interconnection point as in a POVN contract. D'Amico maintained the ICA was a POI IP contract. Because Verizon's IP was in West Orange, and DNS did not collocate in West Orange or use a third party to get its traffic from Newark to West Orange, DNS had to use

---

[4] A "POI IP contract" is a Point of Innerconnection/Interconnection Point contract. According to D'Amico, a POI IP contract involves the CLEC paying the ILEC to get their traffic to the ILEC's interconnection point. Under a POVN contract, the parties "established a point on Verizon's network" whether or not it was an interconnection point, to which the CLEC would pay to bring their traffic.

Verizon's "transport services" for that traffic and pay Verizon for the service. D'Amico explained DNS's ASRs were "failing" because DNS was using a POVN code unavailable for its POI IP contract.

To resolve the issue, D'Amico proposed moving one party's IP to the other party's IP to achieve collocation or its equivalent, and creating a "POVN-like arrangement" even before the ICA could be so modified, or superseded by a proper POVN contract. D'Amico knew the issue could delay DNS's launch date as a CLEC and he wanted to avoid any delay. Thus, D'Amico explained he "cut this . . . side deal." According to his testimony, the "side deal" was implemented but never sufficiently documented so other Verizon employees could realize the agreement was intended to supplement the ICA, which precluded a POVN arrangement.

Verizon employees testified regarding the LIS trunk dispute. During the hearings, DNS presented a December 5, 2014 email from Verizon's Missy Roper to Fajerman, with a copy to Verizon's Sharla Denton, admitting DNS's ASR as "submitted had a PIU of zero, and when the order was processed, it generated a PIU[5] [of] 100." DNS submitted Carey's reply to Roper's email, declaring there

---

[5] PIU means percentage of interstate usage. PLU means percentage of local usage.

should be no "trunk core charges" because the trunks in question were local interconnection trunks. In a March 31, 2015, email, Denton apparently admitted Verizon's error in billing the LIS trunks. According to this email, Denton stated, "We have a staff referral attempting to get the error corrected. . . . Credit definitely due and growing, but is proving difficult to get the correct billing into the system."

In a May 1, 2015 email, Denton noted ongoing difficulties fixing the system to bill DNS correctly. The email again acknowledged DNS "ordered data with [a] PIU [of] zero, and it was entered, a recap was done, and it went in with PIU100."

On November 22, 2015, Fajerman sent an email to Roper, with a copy to Denton, claiming the "credits and corrections were never applied" notwithstanding Denton's purported "adjustments." The next day, Roper responded that DNS's account was moved to a different manager, and she would work with that manager to "look into [Fajerman's] concerns."

Brandon Chase Bartlett, who worked in Verizon's wholesale claims and collection department, took over DNS's billing disputes. From 2013 to 2017, Bartlett served as a senior manager in that department and was responsible for

managing accounts receivable.  In October 2017, Bartlett became associate director for private sector collections.

Bartlett's team inherited DNS's account at the end of 2015.  At trial, Fajerman conceded Bartlett always provided a reason for denying DNS's claims.  However, Fajerman disagreed with Bartlett's reasons for denying the claims.

Carey sent a September 16, 2016 email to Bartlett and Verizon's Leyla Redmon, stating she reviewed the ICA's Interconnection Attachment regarding the LIS trunks.  Carey claimed sections 2.1.1 through 2.1.3.3 of the attachment applied regardless of whether DNS delivered its traffic to Verizon's POI by collocation, or by using an "entrance facility" leased from Verizon or a third party.  Based on her interpretation of these provisions in the Interconnection Attachment, Carey demanded "all dedicated transport and trunk port charges for the LIS trunks" be removed from Verizon's billing statements.  Additionally, she requested Verizon credit DNS for those charges.

The same day, Bartlett sent an email to Fajerman and Carey, with a copy to Redmon, regarding his understanding of DNS's billing disputes.  In the email, Bartlett explained the ICA was not a POVN contract.  As a result, he stated the ICA could not contain a provision that would prevent a transport or "mileage" charge by having each party be responsible for its own costs to deliver traffic to

16

the IP.  Regarding port charges on the LIS trunks, Bartlett acknowledged DNS initially requested trunks with a PIU of zero and a PLU of one hundred, and recognized the matter remained an "open" dispute.

Bartlett agreed with D'Amico that the ICA "[was] a POI IP, not a POVN ICA."  In order to achieve "zero billing," Bartlett understood D'Amico had to devise "a POVN like agreement."  However, D'Amico either did not, or could not, revise the ICA.  Thus, the ICA remained a POI IP contract, which Verizon's "audit team" discovered in its September 2016 review.

According to Bartlett's testimony, Verizon believed executing the ICA with DNS as a POI IP contract meant a POVN arrangement "wasn't available" at the time.  When asked if a POVN contract was available for other similarly situated CLECs, Bartlett stated he was not aware of any at that time.  Bartlett further stated that "D'Amico, when he agreed to this deal in 2014, was supposed to have arranged for a POVN ICA."

Bartlett acknowledged DNS ordered the LIS trunks with zero percent PIU and one hundred percent PLU, and that "the system assigned a PIU of 100 to the local trunks -- when it should have been zero."  When asked "how long [it took] for Verizon to correct that error?"  Bartlett replied the error was "corrected in late 2016 and the correction was issued in January of 2017."

17

Bartlett admitted "whoever did the audit, wasn't aware of th[e side] agreement" D'Amico made with DNS in 2014 to resolve the dispute. Bartlett testified that if he had been involved at the time, he "probably" or "[m]ost likely" would have "checked all of [Verizon's] resources," including the ASR and customer service record. However, Bartlett could not say whether the audit team checked all of Verizon's resources. Even if the audit team checked other resources, Bartlett explained this aspect of the billing dispute was resolved and documented through emails rather than a formal written agreement. Bartlett surmised the audit team may not have reviewed these emails because the team began its investigation by reviewing DNS's contracts and determining "there wasn't a POVN contract on file."

On October 6, 2016, Redmon submitted an internal "Billing Adjustment Request," recommending Verizon issue a credit to DNS in the amount of $29,673.35, representing Verizon's overcharges on the LIS trunks since April 2016. Redmon noted DNS ordered the trunks as "Local Interconnection [trunks] that will not bill a mileage component." According to Redmon, when DNS ordered the trunks, Verizon determined "the physical arrangement of these circuits, at the time of the installation," justified such a billing arrangement. However, because "the language for this type of billing arrangement" was not

18

included in the ICA and the audit team was "unaware" of D'Amico's "side deal," Redmon explained Verizon began billing DNS for transport charges. Bartlett and D'Amico told DNS that prospective bills would be "written to remove the erroneous billing components." While Bartlett "approved" of the solution, actual approval had to be issued by Verizon's director of wholesale financial operations.

During an in-house telephone call in August 2017, D'Amico testified that Bartlett and the collection group agreed to D'Amico's 2014 side arrangement with DNS. Thus, Verizon credited DNS for improper billing of local mileage on the LIS trunks.

Local Access Trunk Billing Dispute

DNS also raised disputes concerning billing for local access trunks. DNS placed orders for four "local access" trunk groups, numbers 102, 104, 114, and 115, to carry its traffic from the Newark collocation facility to a Verizon local access "end office" in West Orange.

According to Bartlett, in or around August 2017, a review assurance team conducted a routine audit. The audit reviewed ASRs customers placed. In August 2017, Redmon told Bartlett that DNS's local access trunks were actually

A-4016-21

ATC trunks, meaning DNS's traffic on those trunks should have been billed for mileage from Newark to West Orange.

Goldstein testified on behalf of DNS.  He explained his expertise focused on "the network architectural level" and "where [CLECs] need an ASR." Goldstein also worked with Carey regarding DNS's billing disputes because of her expertise in the "extremely delicate and arcane process" of filing ASRs.

Goldstein testified DNS did not perform test calls in response to Redmon's August 25, 2017 email because such tests would not have been useful.  He explained DNS's engineers "knew what calls were flowing on their trunks," and asked Verizon "to show . . . any evidence of CDRs."  Goldstein represented Verizon's switches had the ability to log CDRs, and believed Verizon could simply activate such recording for this trunk group to verify the type of traffic it was carrying.

According to the record on appeal, there is no dispute DNS selected "SDUP" as the "network channel."[6]  Goldstein stated SDUP and similar codes are not standardized in the industry as having one specific meaning.  Thus, he

---

[6]  As D'Amico explained, a customer places a network channel code, like "SDUP," into an ASR "which Verizon's provisioning teams use . . . as a guide . . . to know what kind of trunk's billed."

 A-4016-21

explained Verizon incorrectly assumed SDUP necessarily meant ATCs because the term SDUP had multiple meanings.

D'Amico disagreed. He testified SDUP related only to ATCs because SDUN was the code for local interconnection trunks.

Goldstein testified the local access trunks were billed correctly until Verizon's August 2017 audit. Fajerman explained the incorrect billing ceased around December 2017, when Verizon issued a credit for the improper charges.

D'Amico believed data collection for ATC trunk groups was unavailable because he never saw data recording on an ATC trunk group. He presumed call data would have been recorded by DNS as the originating carrier, or by the interexchange carrier for calls routed to it. D'Amico explained Verizon did not act as an interexchange carrier for ATC calls.

Tax Assessment Dispute

DNS also disputed the taxes assessed by Verizon. Fajerman testified Verizon started billing DNS for taxes in October 2015. In a November 24, 2015 email to Verizon's John Ross Davis, Fajerman advised DNS was being charged for taxes, notwithstanding its tax exempt status. Fajerman asked that Verizon cease charging the taxes. Davis agreed to look into the issue.

21

In his December 28, 2015 email, Davis asked Fajerman for information necessary "to update the accounts," "provide support to correct the billing," and determine "the net credit." He sent a copy of this email to Carey and suggested she request the information needed for Verizon to update the accounts.

Bartlett testified Fajerman sent an email attaching a federal tax exemption certificate for DNS. The email and the certificate were dated April 29, 2016. According to Bartlett, this was the first exemption certificate Verizon received from DNS.

On November 9, 2016, Fajerman emailed Redmon, with a copy to Bartlett and Davis, stating "the tax dispute" remained unresolved even though he "gave notice" of the dispute a year earlier and Davis "accepted the dispute." Redmon replied by email the same day, stating Verizon previously instructed DNS to submit a new written claim through Verizon's claim submission website or portal. Redmon stated, "There is no further conversation to be held regarding these disputes, until we can look into them. I cannot have someone look into them until I have a claim with specific details to investigate."

Bartlett testified Verizon issued a credit to DNS for all federal excise taxes "assessed after April 29, 2016." However, Bartlett did not state the date Verizon issued the credit.

22

Late Payment Charge Dispute

DNS also disputed Verizon's LPCs. At the hearing, Fajerman proffered several bills demonstrating Verizon issued LPCs exceeding the 1.5 percent allowed under the ICA. In some instances, Verizon explained the LPC exceeded 1.5 percent because the minimum LPC charge was five dollars. The bills with the disputed LPCs referenced by Fajerman in his testimony were not included in the appellate record. Thus, we are unable to ascertain when Verizon started charging LPCs above the 1.5 percent rate or when DNS first complained to Verizon about excessive LPCs. DNS's complaint, transmitted to Verizon on October 4, 2017, is the earliest document in the record alleging Verizon charged excessive LPCs.

Goldstein testified late fees on Verizon's bills were not itemized charges. Thus, it was difficult for DNS to verify excess charges without retracing and auditing the disputed bills to compute the LPC imposed for each bill. Additionally, he explained DNS lacked the ability to discern whether Verizon assessed the correct compounded interest rate for the LPCs.

The October 6, 2016 Billing Adjustment Request for DNS's LIS trunks also addressed the associated LPCs. In that document, Redmon requested

23

Verizon's bills as of October 6, 2016 be "written to remove the erroneous billing components." Verizon approved the request.

Embargo Dispute

DNS also alleged Verizon failed to negotiate in good faith related to the embargo for services. Bartlett testified the ICA and Verizon's tariff allowed service embargoes. According to Bartlett, an embargo is "a refusal to accept new service orders." However, he explained an embargo did not impact the "repair and maintenance" of existing services. Bartlett called the embargo a "middle of the road" measure because it would be followed by Verizon's request for an "assurance of payment" under the ICA. Bartlett testified an assurance of payment included an escrow deposit, covering two months of billed costs, or a letter of credit. The final step after an embargo under the ICA was termination of the agreement and cessation of all Verizon services.

Verizon sent embargo letters to wholesale customers, such as DNS, about once or twice a week, depending on whether the customer made payments, whether the past-due balance continued accruing, and the customer's overall creditworthiness. Bartlett explained Verizon sent embargo letters to wholesale customers with past due balances as low as $10,000.

24

According to Bartlett, Fajerman told him an escrow deposit would bankrupt DNS. However, in the summer of 2017, Fajerman refused to "show [Bartlett] that [DNS's failure to timely pay was] not a cash flow issue." Despite DNS's non-payment, Verizon did not formally request an assurance and "never stopped services due to non-payment."

On April 12, 2017, Bartlett sent an email to Fajerman, stating DNS's accounts were "seriously delinquent," with an "undisputed past due balance" of approximately $298,000. Bartlett demanded immediate payment from DNS. Bartlett's email also stated, "Failure to pay amounts due may result in further collections activity, including service interruption or refusal to process new orders for service, as permitted under law."

Three weeks later, Fajerman sent Bartlett a "notice of dispute," invoking section 14 of the ICA and designating himself as DNS's representative for dispute negotiations. Bartlett portrayed Fajerman's notice as "a laundry list of vague generalities, but no specifics, no invoice dates, no amounts, no account numbers." According to Bartlett, Fajerman's failure to provide supporting details was typical. Bartlett informed Fajerman that Verizon had no obligation under section 14 of the ICA without details supporting DNS's asserted disputes.

25

Notwithstanding this position, Bartlett sent a May 10, 2017 email to Fajerman advising he was Verizon's "representative" under section 14 of the ICA. Bartlett stated DNS's "net past due" amount of $295,375 "consist[ed] of undisputed amounts, and amounts associated with claims . . . repeatedly addressed and denied by Verizon."

On May 31, 2017, Fajerman stated Bartlett's email communications failed to comply with the dispute resolution protocol under section 14 of the ICA. Fajerman contended Bartlett's emails evidenced a lack of good faith by characterizing the large past due amount as undisputed and demanding immediate payment. Fajerman requested a meeting with Bartlett to negotiate the disputes.

On June 16, 2017, William Carnell, Verizon's assistant general counsel, responded to Fajerman. He replied DNS did not comply with the dispute resolution process because it failed "to provide a 'detailed description'" of the disputes it claimed. Verizon's counsel explained Bartlett and Redmon "promptly responded to any disputes [Fajerman] raised; they analyzed any claims; they met with [Fajerman] telephonically multiple times; and they negotiated in good faith." Carnell stated Verizon's actions were consistent with its obligations under the ICA.

On June 23, 2017, after speaking with DNS's attorney at the time, W. Scott McCollough, Carnell sent an email stating Verizon was "willing to engage on the merits of bona fide disputes." In the email to DNS's attorney at the time, Carnell wrote:

> [Y]ou'll document any specific amounts in dispute and the detailed justification for non-payment of those amounts. You'll provide all claims related to the non-forbearance products by Friday June 30, and the remainder by Monday July 10. We in turn will review and get back to you promptly. I look forward to resolving or at least narrowing as many claims as we can.

Bartlett testified nothing in Carnell's email indicated Verizon agreed to delay the embargo while DNS collected the details to support its disputes.

On July 18, 2017, McCollough forwarded a forbearance account reconciliation spreadsheet to Carnell. Three weeks later, Carnell responded, observing DNS's past due amount was $28,618 greater than the total value of the disputed claims presented by McCollough. Carnell claimed this difference was an undisputed amount and payable immediately. Further, Carnell advised most of the disputed claims were previously raised by DNS and rejected by Verizon. Notwithstanding this position, Verizon again reviewed DNS's claims and found them "without merit."

27

However, DNS raised a new claim that it made payments which Verizon failed to acknowledge. Verizon explained it had no record of DNS's alleged payments and could not trace the payments without "dates, amounts, check numbers, the location to which the payments were sent, and other documentary evidence and remittance details." The only DNS claim Verizon accepted was a requested credit in the amount of $1,680, representing federal excise taxes collected after Verizon received DNS's tax exemption certificate.

On November 27, 2017, Sherry Sandoval of Verizon wrote to Shawn Alexander, also with Verizon, with a copy to Carnell, stating DNS "will likely be shut down in the near future for non-payment." Sandoval sought advice on "how best to manage disconnecting services while positioning to minimize the downside for end customers." She explained DNS "[was] refusing to cooperate, effectively daring Verizon to terminate service, so we are not able to share any details with our Retail sales counterparts, with other possible VPS customers who could take over the services, or even with the end customers."

Bartlett explained Verizon's motive in contemplating such action was to maintain DNS's business operations and avoid having to write off a $1.6 million bad debt that Verizon would be unable to collect. According to Bartlett, if a commercial customer went out of business, Verizon sought to ensure that

whoever that customer served "had a soft landing and their service was uninterrupted, as best as possible, either with Verizon or with some other carrier."

The foregoing is a summary of the facts adduced over the thirteen days of virtual hearings before the ALJ. After the final hearing on April 8, 2021, the ALJ allowed the parties to submit post-hearing briefs and written supplemental filings. The ALJ issued her initial decision on January 28, 2022. DNS and Verizon filed exceptions to the initial decision and replies to the other party's exceptions. The BPU issued a July 13, 2022 order adopting the ALJ's initial decision.

DNS filed an appeal and Verizon filed a cross-appeal from the BPU's July 13, 2022 order. In its appeal, DNS argues the BPU erred in awarding damages to Verizon for breach of contract and requiring DNS's payment to Verizon under an agreement not subject to the BPU's jurisdiction. DNS further asserts the BPU improperly addressed a purported counterclaim asserted on behalf of Verizon. Additionally, DNS claims the BPU overlooked facts admitted by Verizon in its answer to DNS's petition. Finally, DNS contends the BPU's decision was arbitrary, capricious, and unreasonable. In its cross-appeal, Verizon argues the BPU erred in holding Verizon breached its good faith obligations under the

agreements with DNS related to Verizon's imposition of late payment charges and ATC trunk charges.

## I.

We first address DNS's claim the BPU erred in awarding damages to Verizon based on breach of contract. DNS argues the BPU's authority is limited to determining whether a regulated contract for services was breached and awarding damages for breach of contract is beyond the BPU's jurisdiction.

The BPU asserts the dispute presented in DNS's petition involved "the accuracy of Verizon's charges" and whether DNS met its burden of proving Verizon's charges were inaccurate. Contrary to DNS's argument, the BPU contends it awarded no damages to Verizon. Rather, the BPU found DNS failed to prove Verizon's charges were inaccurate. In adopting the ALJ's initial decision, the BPU dismissed DNS's petition and stated DNS "remain[ed] responsible for $39,386 in outstanding charges to be paid to [Verizon]." The BPU expressly stated "[a]ny action . . . for damages shall proceed in the appropriate forum."

An agency is bound by an ALJ's "finding of fact as to issues of credibility of lay witness testimony," and the agency "may not reject or modify" them unless it "determines from a review of a record that the findings are arbitrary,

capricious or unreasonable, or are not supported by sufficient, competent, and credible evidence in the record." N.J.A.C. 1:1-18.6(c). However, an ALJ's "substantive findings" are not binding on the agency. N.J.A.C. 1:1-18.1(d).

Appellate courts have jurisdiction "to review final decisions or actions of any state administrative agency or office." R. 2:2-3(a)(2); see also N.J.S.A. 48:2-43. The BPU's orders must be upheld unless "it clearly appears that there was no evidence before the board to support the [order] reasonably." N.J.S.A. 48:2-46.

"[A]n appellate court reviews agency decisions under an arbitrary and capricious standard." Zimmerman v. Sussex Cnty. Educ. Servs. Comm'n, 237 N.J. 465, 475 (2019). "An agency's determination on the merits 'will be sustained unless there is a clear showing that it is arbitrary, capricious, or unreasonable, or that it lacks fair support in the record.'" Saccone v. Bd. of Trs. of Police & Firemen's Ret. Sys., 219 N.J. 369, 380 (2014) (quoting Russo v. Bd. of Trs., Police & Firemen's Ret. Sys., 206 N.J. 14, 27 (2011)).

The Telecommunications Act of 1996, Pub. L. No. 104-104, 110 Stat. 56 (1996) (codified in sections of 47 U.S.C.) [hereinafter the Act], requires "all local exchange carriers," 47 U.S.C. § 251(b), to offer interconnection to CLECs, id. § 251(c)(2), and to do so pursuant to an ICA, id. § 252(a)(1), which must be

approved by the relevant state commission, such as the BPU.  Id. § 252(e)(1).

The Act also allows an ILEC to provide nonlocal service, or more precisely,

"interLATA services originating in any of [the ILEC's] in region States," on the

condition that the state commission "approves the application" to provide the

services.  47 U.S.C. § 271(b)(1), (d)(1).

Regarding claims for breach of an ICA, as opposed to claims for violations

of the Act, the BPU may review disputes arising under the agreement,

compliance with the agreement's terms, and compliance with the agency's other

rules in the provision of intrastate service to the extent applicable.  Core

Commc'ns, Inc. v. Verizon Pa., Inc., 493 F.3d 333, 343 (3d Cir. 2007).[7]

_____

[7] Core held a telecommunications plaintiff must "seek review by [a state utilities commission] . . . of its claim that the approved interconnection agreement had been breached before resorting to the federal courts."  Core Commc'ns, Inc., 493 F.3d at 337.  In so doing, the Third Circuit applied "Chevron deference" to the Federal Communications Commission's interpretation of the Telecommunications Act of 1996.  Id. at 344.

The United States Supreme Court recently overruled Chevron and its deferential standard of review.  Loper Bright Enters. v. Raimondo, 603 U.S. 369, 412 (2024), overruling Chevron U.S.A. Inc. v. Nat. Res. Def. Council, Inc., 467 U.S. 837, 842 (1984).  However, Loper Bright has no bearing on this matter.

Neither party contested the BPU's initial jurisdiction over the billing disputes.  Whether a federal court has subject matter jurisdiction over an ICA dispute is not relevant here.  Thus, we need not determine whether the Loper Bright decision conflicts with the holding in Core.

"[I]nterpretation and enforcement actions that arise after a state commission has approved an interconnection agreement must be litigated in the first instance before the relevant state commission." Ibid. However, if the state commission finds breach of the agreement, only a trial court may award money damages upon the breach. Id. at 344. New Jersey courts have held as a matter of state law that damages "are beyond [an] agency's authority," Muise v. GPU, Inc., 332 N.J. Super. 140, 163 (App. Div. 2000), and an award of damages must be pursued in court unless "the Legislature has 'explicitly limited the availability of that remedy.'" Ibid. (quoting Boldt v. Correspondence Mgmt., Inc., 320 N.J. Super. 74, 87 (App. Div. 1999)).

Here, the BPU determined the amount DNS owed Verizon for services. However, the BPU never designated the amount as damages awarded to Verizon. DNS presents no authority for its position that BPU's calculation of an amount due under the ICA and other contracts is tantamount to ordering the payment of damages. Additionally, we reject DNS's argument based on the express disclaimer in the BPU's order. In its final agency decision, the BPU stated "[a]ny action by [DNS] for damages shall proceed in the appropriate forum."

## II.

We next consider DNS's argument that the BPU erred in requiring payments pursuant to an agreement not subject to the BPU's jurisdiction. While acknowledging the BPU had jurisdiction over the ICA, DNS claims the BPU lacked jurisdiction over the Wholesale Advantage agreement.

The BPU and Verizon argue DNS, in its petition, stated the Wholesale Advantage agreement had "features, functions and services" federal law placed within the BPU's jurisdiction to approve contracts. They expressly state the BPU has jurisdiction to resolve billing disputes under the Wholesale Advantage agreement. Even if the agreement did not accord jurisdiction to the BPU, Verizon and the BPU contend DNS is judicially estopped from disclaiming a position which it advocated before the ALJ and upon which the ALJ and the BPU relied.

In its petition, DNS alleged Verizon's nonpayment claims related mostly to the forbearance contract, and Verizon imposed an embargo on new orders under the ICA and the Wholesale Advantage agreement to force DNS's payment of past due amounts under the forbearance contract. DNS's petition claimed Verizon violated its duty under the ICA to act in good faith.

A-4016-21

In its petition, DNS also argued the BPU had jurisdiction over the Wholesale Advantage agreement pursuant to 47 U.S.C. § 271 because that contract included interLATA aspects, which the Act assigned to state commission oversight. DNS alleged:

> The parties also have other contractual arrangements. There is a "Wholesale Advantage" contract that is governed by 47 U.S.C. §§ 251 and 252 in part but also includes features, functions and services governed by § 271. This contract is subject to Commission adjudication insofar as it involves an agreement for network elements, the combination of network elements and traffic exchange that remain subject to §§ 251 and 252.

The ALJ cited DNS's argument, noting "[e]vidence as to the amounts involved in non-ICA disputes was permitted only to the extent that those disputes (and the alleged failure to pay those charges) contributed to the decision of Verizon to impose the embargo, a decision claimed by DNS to be evidence of Verizon's bad faith." The ALJ relied on other allegations in DNS's petition, stating the precise question was "[w]hether Verizon incorrectly claimed that as of August 24, 2017, DNS had a past-due balance for tariff and/or ICA-related charges, including for undisputed charges, of $32,991, and a past-due balance of $6,395, under the Wholesale Advantage contract."

A-4016-21

The BPU agreed with the ALJ that the question presented and evidence relevant to the amounts owed "in non-ICA disputes" went to the issue of whether Verizon acted in bad faith by imposing the embargo. At no time during the hearings, or even before the hearings, did DNS claim the BPU lacked jurisdiction to determine amounts allegedly due under the Wholesale Advantage agreement.

As we previously stated, service contracts requiring state commission approval remain under the state commission's jurisdiction for enforcing compliance with contractual and legal requirements and adjudicating disputes. Core, 493 F.3d at 340-43. On this record, we are satisfied the BPU had jurisdiction to render a determination on the amounts DNS owed under the Wholesale Advantage agreement. And the matter was fully litigated without protest or an assertion of prejudice by the parties.

Further, DNS is judicially estopped from arguing the BPU lacked jurisdiction over the billing dispute under the Wholesale Advantage agreement. Under the doctrine of judicial estoppel, a party is prevented from advancing an opposite position to a previously asserted position on which a court relied. Tamburelli Props. Ass'n v. Borough of Cresskill, 308 N.J. Super. 326, 335 (App. Div. 1998); Cummings v. Bahr, 295 N.J. Super. 374, 385 (App. Div. 1996).

DNS never argued the BPU lacked jurisdiction over the Wholesale Advantage agreement at any point during the proceedings before the ALJ. To the contrary, DNS's petition expressly asserted the agreement was "subject to [BPU] adjudication insofar as it involves an agreement for network elements, the combination of network elements and traffic exchanges that remain subject to [the Act]." Having taken this position before the ALJ, DNS is judicially estopped from arguing the BPU lacked jurisdiction over the Wholesale Advantage agreement.

III.

We next consider DNS's argument the BPU erred in awarding damages to Verizon absent the filing of a counterclaim. We reject this argument.

DNS's argument fails because counterclaims are not permitted in public utility cases. The public utility is limited to filing an answer to a petition, containing admissions, denials, and affirmative defenses. N.J.A.C. 14:1-6.1.

Additionally, as we previously stated, the BPU did not award damages to Verizon. Rather, before the ALJ and the BPU, the issue was whether DNS met its burden of proving Verizon's bills as to the amounts owed under the ICA and Wholesale Advantage agreements were incorrect. Neither the ALJ nor the BPU referenced a counterclaim asserted by Verizon.

The ALJ explained she had to determine whether DNS was obligated to pay Verizon for services and whether DNS met its burden of proving Verizon's bills were erroneous. In finding DNS failed to meet that burden, the ALJ wrote:

> I FIND that petitioner did not present adequate documentary evidence of the bills it challenges, the charges on those bills which it disputes and did not pay, and the amounts it did pay. Despite introducing many exhibits, the bills (or the "summary of charges" pages from those bills) showing the amounts Verizon allegedly overcharged or erroneously charged were not introduced.

The BPU agreed with the ALJ's initial decision. Because "[t]he [p]etition was initiated by DNS based upon monies sought by [Verizon]," the BPU explained "the burden of proof regarding alleged errors in the amounts sought rest[ed] with [DNS]." The BPU also adopted the ALJ's credibility determinations and her finding that DNS failed to meet its burden of proof.

A utility's customer of record "shall be responsible for payment for all utility service rendered." N.J.A.C. 14:3-7.1(a). The customer may dispute a charge by notifying the utility, but it still "shall pay all undisputed charges." N.J.A.C. 14:3-7.6(a). "In proceedings before an administrative agency," matters are to be proved "by a preponderance of the believable evidence." Atkinson v. Parsekian, 37 N.J. 143, 149 (1962); accord SSI Med. Servs., Inc. v. State, Dep't of Hum. Servs., 146 N.J. 614, 622 (1996). On appeal, the agency's factual

determinations "are generally sustained if they are supported by substantial evidence on the whole record." Atkinson, 37 N.J. at 149.

DNS bore the burden of showing Verizon wrongfully demanded payment based on erroneous billing. The ALJ required DNS produce the bills evidencing the claimed errors as primary evidence to support the secondary evidence presented in DNS's spreadsheets, emails, and other work product related to the billing disputes. The ALJ's need for the actual bills was based on Verizon's affirmative defense that its billing was accurate rather than an imaginary counterclaim.

## IV.

We also reject DNS's argument that Verizon's answer failed to deny specifically and in detail the material allegations in the petition. DNS asserts Verizon's failure to deny allegations, other than the amount due, should have been admitted for purposes of any subsequent judicial proceeding.

In DNS's post-hearing brief presented to the ALJ, it first asserted Verizon failed to deny certain of the petition's material allegations, and that failure constituted an admission of the allegations under N.J.A.C. 14:1-6.1(b) and Rules 4:5-3 and 4:5-5. As the ALJ aptly explained in rejecting this argument, the cited Rules did not apply and the BPU's regulations "only provide that an answer must

'apprise the parties and the Board fully and completely of the nature of the defense and shall admit or deny specifically and in detail all material allegations of the petition.'"

Further, the ALJ noted the BPU's rules emphasize fairness, accord a fact-finder discretion in applying the BPU's rules, and permit reference to the New Jersey Court Rules absent other guidance. Because the ALJ found the allegations in question were "fully litigated," she concluded declaring Verizon's answers to the petition to be admitted based on DNS's contrived pleading deficiency "would result in prejudice to Verizon and in a tremendous waste of government resources."

"Pleadings before the Board shall be petitions, answers, and replies." N.J.A.C. 14:1-4.1(a). An answer "shall be so drawn as to apprise the parties and the Board fully and completely of the nature of the defense and shall admit or deny specifically and in detail all material allegations of the petition." N.J.A.C. 14:1-6.1(b).

Further, the New Jersey Uniform Administrative Procedural Rules (UAPR) "govern the procedural aspects pertaining to . . . the conduct of the hearing and the rendering of the initial and final decisions in all contested cases," subject only to "superseding Federal or State law." N.J.A.C. 1:1-1.1(a). The

UAPR "shall be construed to achieve just results, simplicity in procedure, fairness in administration and the elimination of unjustifiable expense and delay." N.J.A.C. 1:1-1.3(a). The BPU's own practice and procedural rules under the Administrative Code, "shall be liberally construed . . . to secure just and expeditious determination of issues properly presented to the Board." N.J.A.C. 14:1-1.2(a).

Here, the ALJ found that Verizon's answer to DNS's petition provided a clear picture of Verizon's defenses to DNS's allegations. She noted Verizon admitted only those allegations when it "specifically" used the term "admit." During the hearings, DNS presented vigorous arguments in opposition to Verizon's affirmative defenses. DNS's assertion of strong arguments in response to Verizon's defenses belies any claim DNS suffered prejudice or lacked notice regarding Verizon's arguments due to the purported absence of specific denials to the allegations in the petition.

We discern no abuse of discretion in the ALJ's implicit finding DNS suffered no prejudice in preparing for, or participating in, the hearings based on Verizon's answers to the petition. The ALJ liberally construed the BPU's rules in rejecting DNS's claim that anything not expressly denied by Verizon should

have been deemed admitted. To have decided otherwise would have been fundamentally unfair to the parties under the circumstances.

V.

We next consider DNS's argument the BPU acted arbitrarily in adopting the ALJ's initial decision without considering the errors raised by DNS. We disagree.

The ALJ relied on Brunswick Hills Racquet Club, Inc. v. Route 18 Shopping Center Associates, 182 N.J. 210 (2005), to determine whether Verizon breached the ICA's covenant of good faith. Under Brunswick Hills, the ALJ concluded DNS had to "show bad intentions motivated Verizon's actions." Citing Brunswick Hills, the ALJ explained "[a] party who acts in good faith on an honest, but mistaken, belief that his or her actions are justified has not breached the covenant of good faith and fair dealing," but "'[s]ubterfuges and evasions' in the performance of a contract violate the covenant of good faith and fair dealing 'even though the actor believes his conduct to be justified.'"

Regarding the tax charges, the ALJ reviewed the ongoing communications between Fajerman and Verizon, starting with Fajerman's November 2015 complaint to Davis through Verizon's eventual correction of the tax charges in November 2016. The ALJ found that Verizon credited all of the tax charges

42

upon DNS's resubmission of the required tax exemption certificates. The ALJ determined there was "no evidence of malicious intent" on the part of Verizon, notwithstanding the "evidence of mismanagement at the Verizon staff level, inconsistent communication with a customer, and inconsistent application of policy regarding the method of disputing charges." After reviewing the evidence and testimony, the ALJ concluded Verizon's mishandling of the disputed tax billings did not constitute bad faith.

Regarding the billing dispute over the LIS trunks, the ALJ found "there were several billing issues . . . from the time of installation" in 2014 until Verizon resolved the issue in 2016. The ALJ summarized the history of the LIS trunk dispute as follows: DNS's ordering of the LIS trunks in POVN terms; the inconsistency of DNS's ASR for the LIS trunks, as placed, with an ICA that was limited to a POI IP arrangement; D'Amico's "side agreement" in April 2014 using collocation; and Verizon's issuing a credit to DNS for the erroneous trunk charges in June 2015. As the ALJ explained, "for some inexplicable reason," the side agreement "was never shared with the persons at Verizon in charge of billing," so the billing error recurred until resolved in September 2016.

The ALJ found DNS "reached an agreement with Verizon's representative, D'Amico, for POVN-type billing on LIS trunks and reasonably

expected to obtain the benefits of that agreement." When D'Amico proposed the side agreement in April 2014, he also proposed modifying the ICA or executing a new ICA to permit POVN billing arrangements. However, the ALJ noted neither event occurred. Based on the evidence, the ALJ determined the billing error and the delay in finally resolving the error was due to Verizon's mistakes. Nevertheless, the ALJ found "the failure of communication between various Verizon departments (as was seen with the POVN dispute) and even the failure of Verizon to respond in a timely fashion was not, however, proof of motive to impose economic harm on DNS." The ALJ concluded DNS failed to prove that Verizon acted in bad faith in resolving the LIS trunks dispute.

In analyzing the failure to negotiate or otherwise follow the ICA's dispute resolution protocols before Verizon imposed the embargo, the ALJ quoted section 9.3 of the ICA, which required DNS to give Verizon notice of "the amounts it dispute[d]" and also "the specific details and reasons for disputing each item." The ALJ also noted that section 9.3 allowed notice by DNS to apply "prospectively" to "a class of charges it disputes" without need for resubmission.

The ALJ found Verizon did not "specifically" violate section 9.3 by requiring a new notice if DNS continued to dispute a charge after Verizon denied a claim. She further determined Verizon did not violate section 9.3 by requiring

44

a new notice if the initial notice "provided insufficient information." The ALJ concluded that "DNS failed to provide documents showing that Verizon violated Section 9.3," notwithstanding their frustration resulting from Verizon employees inconsistently applying the company's "policies regarding substantiation of claims."

Reviewing section 14 of the ICA's dispute resolution process, the ALJ cited certain correspondence from February 2017 through July 2017 regarding unpaid balances on all accounts, not just under the ICA. The correspondence started out between Fajerman and Bartlett and later involved counsel for DNS and Verizon.

The ALJ found DNS did not provide the detailed description of the dispute required under section 14. Thus, she held Verizon did not violate section 14 of the ICA. The ALJ also explained Verizon's embargo was justified by undisputed past due amounts on all accounts, which precluded a finding that Verizon's embargo constituted bad faith. As the ALJ wrote:

> Further, as was explained throughout these proceedings, the Board will not decide the accuracy of the charges DNS claims Verizon imposed in error across other, non-regulated accounts. As was made clear through the testimony of both parties' witnesses, by September 2017, there were outstanding charges for services across all DNS accounts that were not in dispute. The fact of unpaid balances supports the

> decisions of Verizon to take punitive action, including an embargo on future services, and mitigates a finding of bad faith.

The ALJ concluded Verizon's incorrect interpretation of the order limiting the embargo to services provided under the ICA was merely a mistake regarding the scope of the order and did not amount to "evidence of bad faith."

"[E]very contract in New Jersey contains an implied covenant of good faith and fair dealing." Sons of Thunder, Inc. v. Borden, Inc., 148 N.J. 396, 420 (1997). The covenant provides "that 'neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract.'" Ibid. (quoting Palisades Props., Inc. v. Brunetti, 44 N.J. 117, 130 (1965)). "Although the implied covenant of good faith and fair dealing cannot override an express term in a contract, a party's performance under a contract may breach that implied covenant even though that performance does not violate a pertinent express term." Wilson v. Amerada Hess Corp., 168 N.J. 236, 244 (2001) (citing Sons of Thunder, 148 N.J. at 419). Even if a contract expressly permits unilateral termination without cause, the terminating party has "an obligation of good faith performance up until its right of termination [is] actually effective." Sons of Thunder, 148 N.J. at 421 (emphasis

A-4016-21

in original) (quoting United Roasters, Inc. v. Colgate-Palmolive Co., 649 F.2d 988, 990 (4th Cir. 1981)).

In determining whether a party demonstrated good faith in performing its obligations under a particular contract provision, the court's task "is to identify in that context the parties' reasonable expectations." Wilson, 168 N.J. at 246. In Wilson, the Court explained discretion in the exercise of good faith cannot be used "in a way that intentionally subjects the other party to a risk beyond the normal business risks that the parties could have contemplated at the time of contract formation," ibid. (emphasis added), and noted "the importance of demonstrating bad motive in order to assert successfully a claim of breach of the implied covenant of good faith and fair dealing." Id. at 249. "Without bad motive or intention, discretionary decisions that happen to result in economic disadvantage to the other party are of no legal significance." Id. at 251. However, the existence of a bad faith motive is a question for the factfinder. Id. at 253-54.

Bartlett, who the ALJ stated "appeared reasonable, candid and credible," testified Verizon was motivated to keep DNS in business to avoid having to write off an uncollectable debt of nearly $1.6 million at the time of the embargo. Despite this concern, Bartlett rejected Fajerman's assertion that a request for an

assurance of payment in the form of an escrow deposit would bankrupt DNS. Fajerman even refused to provide a copy of DNS's financial statement demonstrating DNS's precarious fiscal circumstances. As the ALJ concluded, near bankrupt status was needed for DNS to lose the "benefit of the bargain" of its contracts with Verizon, including the ICA, in support of an inference that Verizon acted in bad faith and should have recognized the embargo risked DNS's financial collapse.

The ALJ concluded Verizon's conduct did not constitute bad faith based on her credibility determinations and fact-findings after hearing the witnesses' testimony and reviewing the credible and sufficient evidence adduced at the hearings. We discern nothing arbitrary in the judge's conclusions related to Verizon's LIS trunk charges, tax charges, and compliance with the ICA.

## VI.

We next consider Verizon's cross-appeal. In its cross-appeal, Verizon argues the ALJ and the BPU erred in finding Verizon lacked good faith related to the LPCs and ATC trunk charges. We reject Verizon's arguments.

For the LPCs, the ALJ noted the ICA limited such charges to 1.5 percent per month. Fajerman claimed Verizon's minimum LPC charge of five dollars exceeded the permissible rate. Fajerman testified credibly and without

contradiction that Verizon's calculation of the LPC was excessive because Verizon used a constant that always resulted in "a monthly rate above 1.5 percent."

At the hearing, Bartlett admitted "other customers [we]re impacted" by the LPCs. He stated "Verizon's investigation was continuing," and represented "the system would be corrected" in the future.

DNS first "provide[d] a written explanation of its argument with respect to this issue" in its complaint and petition to the BPU, filed in late September 2017, and transmitted to Verizon the following week. Based on Bartlett's testimony at the December 2020 hearing, the ALJ found it was clear "Verizon waited more than three years to investigate" the LPC issue.

Although Bartlett may have lacked personal knowledge of the LPC issue any earlier, the ALJ concluded "[s]omeone at Verizon, however, was responsible for setting rates for LPCs in excess of that permitted under the ICA," and there was no indication the "routine audits" for billing purposes as described by Bartlett included "audits to ensure billing [was] consistent with contracts." Thus, the ALJ concluded Verizon violated its contractual good faith obligation by imposing "LPCs in violation of the terms of the ICA and its failure, once notified of the potential violation, to promptly investigate."

Regarding the erroneous billing of the four local trunk groups as ATC trunks instead of the "tandem" trunks DNS intended to order, the ALJ found the trunks were ordered and installed between late 2014 and 2016, but not billed for mileage as if they were ATC trunks until August 2017. The issue was discovered only after Verizon's billing team reviewed DNS's accounts and concluded the accounts should have been billed as ATC trunks. When Fajerman objected, Bartlett instructed him to file a formal complaint after the charges appeared on an invoice. Instead, DNS filed its petition. At some point prior to the hearing, the ALJ found "Verizon unilaterally credited DNS for all past-due amounts and changed the billing to zero" mileage on those trunks. Thus, the ALJ noted there was an open question whether Verizon acted in bad faith regarding the trunk charges.

The ALJ reviewed the testimony regarding the meaning of the network channel and SDUP codes used in DNS's ASR for the trunks. She noted the failure of both parties to perform tests at any time before the hearing to determine the nature of the trunks and their traffic.

Because the proper manner of billing those trunks was rendered moot prior to the hearing, the ALJ addressed how the billing changes occurred. She found Verizon changed the trunk billing days before the billing group consulted

D'Amico and "the technical support staff at Verizon with the most knowledge of ATC and local trunk programming."

The ALJ concluded Verizon acted in bad faith by "changing billing on four disputed trunk groups to that charged for ATC trunks without exercising due diligence to support such a change." As the ALJ wrote:

> [W]hile there may be adequate grounds for Verizon's decision to change billing of local trunks from tandem to ATC, all evidence shows that Verizon neglected to conduct the inquiry necessary to support such action prior to changing the billing. I CONCLUDE that Verizon's failure to exercise the same diligence prior to changing the billing that it exercised after the customer complained, particularly given the ongoing disputes with this customer, showed an absence of good faith.

The ALJ properly treated the LPCs and trunk charges differently from other charges imposed by Verizon. As for the ATC trunks, Verizon found a way to resolve the dispute and bill for those charges in line with DNS's expectations only to have Verizon's billing team change the charges after a cursory review. As for the LPCs, Bartlett admitted the charges were the result of a system error affecting DNS and other customers. Yet, it took Verizon three years to resolve the problem. There was no indication in the record that Verizon took any action to resolve the problem immediately after learning of the issue through DNS's petition.

Having reviewed the record, consistent with the testimony, the ALJ concluded Verizon's handling of the LPCs and ATC trunk charges constituted bad faith. She found Verizon's actions regarding these billing disputes reflected a higher degree of carelessness and indifference by Verizon and deprived DNS of its reasonable expectation with respect to Verizon's diligence in performing its contractual obligations. We discern no abuse of discretion in the BPU's decision adopting the ALJ's initial decision regarding Verizon's bad faith conduct related to the LPCs and ATC trunk charges.

Affirmed as to the appeal and cross-appeal.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION